UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY LAWRENCE
CALDWELL,

              Plaintiff,

v.                                           Civil Case No. 13-15283
                                           Honorable Linda V. Parker

CITY OF SOUTHFIELD, ET
AL.,

              Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This action arises from the shooting of Plaintiff by a City of Southfield

police officer on January 23, 2012, following a high speed chase where officers

from the City of Southfield and the City of Detroit attempted to arrest Plaintiff for

a series of armed robberies.  Plaintiff, who is pro se and a Michigan Department of

Corrections prisoner, alleges violations of his Fourth Amendment rights under 42

U.S.C. § 1983 and gross negligence under Michigan law.[1]  Defendants are the City

---

[1] The second count in Plaintiff's Amended Complaint is titled "Gross Negligence and Intentional Infliction of Mental and Emotional Pain."  (ECF No. 23 at Pg ID 107.)  The allegations that follow, however, do not support an intentional infliction of emotional distress claim.  (*Id.* at Pg ID 108.)  In their brief in support of their summary judgment motion, Defendants argue that to the extent Plaintiff is alleging (cont'd . . .)

of Southfield, the Southfield Police Department, and the following Southfield police officers: Blake Matatall, Jeffrey Jagielski, James Dziedzik, Craig Karinen, John Seeling, Teresa Young, Kenneth Rochon, Gerald Wakefield, William Shadwell, Jason Schneider, David McCormick, Lawrence Porter, and Jane Doe (collectively "Defendants").

Presently before the Court is Defendants' motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56 on April 14, 2015. (ECF No. 43.) Plaintiff filed a response to the motion on May 11, 2015. (ECF No. 52.) Defendants filed a reply brief on May 19, 2015. Plaintiff subsequently sought leave to file a supplemental response brief and exhibits, which this Court granted in part and denied in part on July 6, 2015. (ECF Nos. 56, 59.) Having considered the parties' pleadings, including Defendants' arguments in response to Plaintiff's supplemental brief and two videos filed on July 7, 2015, the Court concludes that Defendants are entitled to summary judgment.

---

such a claim, the analysis of his excessive force claim is dispositive. (ECF No. 43 at Pg ID 331 n.5.) Plaintiff does not respond to this argument and therefore is deemed to have abandoned the claim. *See Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (finding that, when a plaintiff did not properly respond to arguments asserted by a defendant's motion for summary judgment as to two claims, "the District Court did not err when it found that the Appellant abandoned [those] claims"); *Anglers of the Au Sable v. United States Forest Serv.*, 565 F. Supp. 2d 812, 839 (E.D. Mich. 2008) ("It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment.").

## I.     Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II. Factual and Procedural Background

Between January 20 and 22, 2012, at least seven armed robberies were committed in the Detroit metropolitan area which appeared to have been perpetrated by the same individual. The first occurred at a convenience store in Warren at around 4:00 a.m. on January 20, 2012. (ECF No. 43, Ex. 1.) The suspect, wearing a black knit hat, a black scarf, a black jacket, black pants, and gloves, ordered the clerk at gunpoint to give him all the cash in the register drawers, approximately $200.00. (*Id.*) The suspect also ordered the clerk to hand over the keys to her vehicle, a 2004 Dodge Dakota pick-up truck. (*Id.*) The suspect fled the scene in the clerk's stolen vehicle. The perpetrator was described as a black male, 25-30 years old, 5'8'', and 170 pounds. (*Id.*)

About an hour later, an individual matching the same description and described to be wearing similar clothing committed an armed robbery at a gas

4

station in Grosse Pointe Woods. (*Id.*, Ex. 2.) In addition to stealing $600.00, the suspect took the clerk's cell phone and a cell phone charger. (*Id.*) He drove from the gas station in the previously stolen Dodge Dakota. (*Id.*)

At around 11:40 a.m. on January 20, 2012, a third armed robbery occurred at a convenience store in Center Line. (*Id.*, Ex. 3.) The suspect's description matched the earlier robberies. (*Id.*) The suspect threatened the clerk with a gun and demanded all the cash in the register drawers. (*Id.*) He stole approximately $110.00. The suspect fled on foot. (*Id.*) Footprints in the snow from the store ended near the alley behind the store and tire tracks were observed in the alley; however, the tire tracks ended at the main street. (*Id.*)

A fourth armed robbery was committed at around 4:00 a.m. the following day, January 21, 2012, at a convenience store in Roseville. (*Id.*, Ex. 4.) The suspect was described as wearing a black hat, a black scarf, a black coat, gray sweatpants, and a glove on his left hand. (*Id.*) He also was described as a black male, about 5'6"-5'10", and about 19 years old. (*Id.*) The suspect again ordered the clerk, at gunpoint, to give him all the cash in the register drawers. (*Id.*) Approximately $200.00 was stolen. (*Id.*) The suspect fled the scene in the stolen Dodge Dakota. (*Id.*)

At around 3:00 a.m. on January 22, 2012, a fifth armed robbery occurred at a different convenience store in Roseville. (*Id.*, Ex. 5.) The suspect-- matching the

5

description of the perpetrators of the previous robberies and wearing similar clothing-- ordered the clerk, at gunpoint, to give him all the cash in the cash drawers.  (*Id.*)  The suspect also ordered the clerk to relinquish the keys to his vehicle, a 2007 Honda Accord with license plate number CFP 1423.  (*Id.*)  The suspect stole approximately $150.00, and fled the scene in the stolen Honda Accord.  (*Id.*)

A sixth armed robbery was committed at a hotel in Southfield approximately an hour later.  (*Id.*, Ex. 6.)  A similarly described suspect, wearing similarly described clothing, ordered the clerk to give him all the cash in the registers.  (*Id.*) He fled the scene in the stolen Honda Accord with approximately $281.00 in stolen cash.  (*Id.*)

At around 7:00 p.m. on January 22, 2012, another armed robbery occurred at a hotel in Troy.  (*Id.*, Ex. 7.)  The suspect was described as a young, black male, possibly mid-twenties, between 170-180 pounds, approximately 5'7", and wearing clothing similar to the items worn in the previous robberies.  (*Id.*)  The suspect threatened the clerk with a gun and ordered her to give him all of the cash in the registers.  (*Id.*)  He took approximately $449.00 in cash, as well as the clerk's laptop and cell phone.  (*Id.*)  The suspect drove away in the stolen Accord.  (*Id.*)

Between January 20 and 23, 2012, Defendant Lawrence Porter, a Sergeant with the Southfield Police Department and, at the time, supervisor of the Tactical

6

Crimes Suppression Unit ("TCSU"), became aware of the seven armed robberies through "BOLO" teletypes and internal crime logs. (ECF No. 44, Ex. 8 ¶¶ 2-3.) Through the teletypes and logs, Sergeant Porter received information concerning the suspect's description and clothing, the manner in which the armed robberies were committed, the items stolen, and how the suspect fled the crime scenes-- specifically that he had used two stolen vehicles. (*Id.* ¶ 3.) Sergeant Porter also learned that the suspect had abandoned the Dodge Dakota in Detroit, near the intersection of Schoenherr Street and Manning Street, sometime after stealing the Honda Accord in the Roseville robbery. (*Id.* ¶ 4.)

On January 23, 2012, Sergeant Porter briefed Defendants Blake Matatall, David McCormick, Jason Schneider, and Jeffrey Jagielski-- City of Southfield police officers who were assigned to the TCSU-- on the seven armed robberies and directed them to search for the stolen Accord near the area where the Dakota had been abandoned. (*Id.* ¶ 7; *see also* Exs. 10-13 ¶¶ 2-3.) Sergeant Porter and Officer McCormick canvassed the area for the stolen Accord in unmarked patrol cars. (*Id.*, Ex. 8 ¶ 8; Ex. 11 ¶ 5.) Officers Matatall, Schneider, and Jagielski searched for the car in semi-marked patrol units equipped with lights and sirens. (*Id.*, Ex. 8 ¶ 8; Ex. 10 ¶ 5; Ex. 12 ¶ 5; Ex. 13 ¶ 5.) Sergeant Porter and the officers communicated via radio broadcast. (*Id.*, Ex. 10 ¶ 6.)

7

Officer McCormick located the stolen Accord, which was parked and unoccupied, in the Bel-Air Shopping Centre near Eight Mile Road and Van Dyke Avenue in Warren.  (*Id*., Ex. 11 ¶ 6.)  Several minutes later, he observed three individuals enter the stolen Accord.  (*Id*. ¶ 7.)  One of the individuals, dressed in black clothing, matched the description of the suspects in the series of armed robberies.  (*Id*.)  The stolen Accord left the shopping center and headed toward Eight Mile Road.  (*Id*. ¶ 8.)  Officer McCormick followed and reported the direction of the vehicle to the other officers.  (*Id*.)

Sergeant Potter spotted the stolen Accord and observed an individual-- later identified as Plaintiff-- in the driver's seat.  (*Id*., Ex. 8 ¶ 11.)  Sergeant Potter notified dispatch and the Detroit Police Department that TCSU located the stolen Accord.  (*Id*. ¶ 12.)  Sergeant Porter and Officer McCormick believed that Plaintiff then spotted a patrol unit because he suddenly accelerated, swerved through traffic, ran a red light, and headed into a residential neighborhood.  (*Id*. ¶ 13; Ex. 11 ¶ 9.)  Sergeant Porter and Officer McCormick lost sight of the Accord.  (*Id*., Ex. 8 ¶ 14; Ex. 11 ¶ 9.)

Officer Schneider subsequently located the Accord, which was parked and unoccupied, in front of what was later determined to be Plaintiff's residence.  (*Id*., Ex. 12 ¶ 9.)  As he was in a semi-marked patrol car, Officer Schneider left the area and Officer McCormick and Sergeant Porter-- in unmarked vehicles-- set up

8

surveillance.  (*Id.* ¶ 10.)  Officer McCormick observed Plaintiff, who had changed clothing, enter the driver's side of the stolen Accord and pull away from the residence.  (*Id.*, Ex. 11 ¶ 12; Ex. 14 at 44-45, 50-51, 78-79.)  Officer McCormick conveyed this information to TCSU via radio broadcast and Sergeant Porter notified the Detroit Police Department and proceeded to follow the Accord.  (*See, e.g., id.*, Ex. 12 ¶ 6; Ex. 8 ¶¶ 18-19.)

A marked patrol unit from the Detroit Police Department pulled up behind the Accord and the officer activated his lights and sirens.  (*Id.*, Ex. 8 ¶¶ 20-21.) Plaintiff accelerated and fled.  (*Id.* ¶ 21; Ex. 14 at 45, 49, 51.)  A chase ensued with the Detroit Police Department unit behind the Accord and Sergeant Porter several blocks behind the Detroit Police Department unit.  (*Id.*, Ex. 8 ¶ 22.)  Sergeant Porter broadcasted the direction of the chase to TCSU and directed TCSU to try and get ahead of the chase.  (*Id.* ¶¶ 22-23.)

For reasons unknown, the Detroit Police Department unit pulled off to the side of the road.  (*Id.* ¶ 24.)  Sergeant Porter continued his pursuit and, soon thereafter, Officer Matatall joined the chase behind him.  (*Id.* ¶ 25; Ex. 8.) Sergeant Porter instructed Officer Matatall to assume the primary position, as Officer Matatall was in a semi-marked vehicle.  (*Id.*, Ex. 8 ¶ 9; Ex. 10 ¶ 9.)  Once he assumed the primary position, Officer Matatall activated his lights and siren. (*Id.*, Ex. 10 ¶ 10; Ex. 8 ¶ 28.)  Plaintiff continued to flee, at times traveling 70

9

miles per hour in residential zones with speed limits of 25 miles per hour.  (*Id*., Ex. 10 ¶ 12.)

With their lights and sirens activated, Officers Jagielski and Schneider approached the chase from the opposite direction in an attempt to block Plaintiff's path with their vehicles.  (*Id*., Ex. 12 ¶¶ 15, 19-20; Ex. 13 ¶¶ 8-10.)  Due to Plaintiff's excessive speed and perceived inability to maintain control of his vehicle, the officers ended up swerving out of the way.  (*Id*., Ex. 12 ¶ 20; Ex. 13 ¶ 10.)  With Officer Matatall and Sergeant Potter still in pursuit, Plaintiff attempted to turn into an alley near Seven Mile Road and Reno Street in Detroit.  As shown in two videos submitted into evidence at Plaintiff's request, Plaintiff lost control of the Accord as he attempted to pull into the alley, and he crashed the vehicle into the corner of a building.[2]  (*Id*., Ex. 10 ¶ 15; Ex. 8 ¶¶ 31-32.)  The Accord bounced off the building and began rolling backwards, at which point Plaintiff quickly exited the vehicle and ran into the alleyway.  (*Id*., Ex. 10 ¶ 16; Ex. 8 ¶ 33.)  Officer Matatall observed Plaintiff reach into the waistband of his pants as he began running from the Accord.[3]  (*Id*. Ex. 8 ¶ 34; Ex. 10 ¶ 16; Ex. 12 ¶¶ 23, 24.)  Plaintiff

_____

[2] One of the videos contains footage from a camera mounted on the building.  The second video contains a WDIV newscast segment covering the incident in which the footage from the building camera is shown.

[3] Sergeant Porter and Officer Schneider-- whose vehicles were behind Officer Matatall's in the pursuit-- also attest to witnessing Plaintiff reach into the waistband of his pants.  (ECF No. 43, Ex. 8 ¶ 34; Ex. 12 ¶¶ 23, 24.)  Having (cont'd . . .)

explains that he wears his pants below his waist and that he "pulled them up immediately after [he] wrecked the Accord." (ECF No. 52, Att. B ¶ 5.)

After Plaintiff crashed the Accord and began to flee on foot, Officer Matatall quickly exited his vehicle and immediately fired a volley of shots in Plaintiff's direction. (*Id.*, Ex. 8 ¶ 35; Ex. 10 ¶ 17; Ex. 12 ¶ 25.) According to Officer Matatall, he fired the shots to prevent the escape of a violent, fleeing felon. (*Id.*, Ex. 10 ¶ 17.) Plaintiff continued to run, however. (*Id.* Ex. 10 ¶ 18.)

Officer Matatall chased Plaintiff through the alley until Plaintiff turned onto a road that intersected with the alley. (*Id.* ¶ 19.) At that point, Officer Matatall lost sight of Plaintiff and returned to his patrol car. (*Id.* ¶¶ 19-20.)

---

reviewed the video capturing the collision, however, the Court questions whether any officer, but Officer Matatall, was close enough to Plaintiff to witness this gesture. The accuracy of Sergeant Porter's and Officer Schneider's statements is immaterial though, as Plaintiff admits to reaching for his waistband. The remaining defendants were either not involved in the chase or were not near the area when Plaintiff crashed the Accord. (*Id.*, Ex. 9 ¶ 4; Ex. 11 ¶¶ 15-16, Ex. 13 ¶¶ 12-14; Ex. 15 ¶¶ 3-4; Ex. 16 ¶¶ 3-4; Ex. 17 ¶¶ 3-4; Ex. 18 ¶ 3; Ex. 19 ¶ 3; Ex. 20 ¶ 3.) Officers McCormick had lost sight of the chase when Plaintiff sped away upon the arrival of the Detroit Police Department patrol unit and was covering the main roads in the event Plaintiff eluded the officers involved in the chase. (*Id.*, Ex. 11 ¶¶ 14-15.) Officer Jagielski was in the line of police vehicles chasing Plaintiff, but he arrived on the scene after Plaintiff had crashed the accord and fled. (*Id.*, Ex. 13 ¶¶ 11-14.) Officers Rochon, Karinen, and Seeling arrived after Plaintiff was arrested to conduct evidence collection. (*Id.* Exs. 15-17 ¶ 3.) Detectives Wakefield, Dziedzic, and Shadwell were not involved in the pursuit, shooting, apprehension, or arrest of Plaintiff. (*Id.* Exs. 18-20 ¶ 3.)

11

In the meantime, Sergeant Porter had driven a few blocks away from where Plaintiff entered the alleyway in an attempt to cut him off.  (*Id.*, Ex. 8 ¶¶ 37-38; *see also* Ex. 6 at Pg ID 410.)  After exiting his patrol car, Sergeant Porter observed Plaintiff on the other side of a fence and ordered him, at gunpoint, to stop.  (*Id.* ¶¶ 39-40.)  Plaintiff fled between houses.  (*Id.* ¶ 41.)  Sergeant Porter jumped the fence and pursued Plaintiff into the rear yard of a house, at which time he heard the door of the garage inside the yard close.  (*Id.* ¶ 42; Ex. 6 at Pg ID 410.)  Although he suspected that Plaintiff had closed the garage door and was hiding inside, Sergeant Porter ran to the front yard to see if Plaintiff had cleared the fence and escaped the yard.  (*Id.* ¶ 43.)  Not seeing Plaintiff, Sergeant Porter secured the garage.  (*Id.* ¶ 44.)

Within minutes, three Detroit Police Department officers joined Sergeant Porter outside the garage.  (*Id.* ¶ 45.)  Sergeant Porter gave Plaintiff multiple orders to exit the garage, with no response.  (*Id.* ¶ 47.)  Sergeant Porter and the officers then entered the garage and found Plaintiff hiding behind a washing machine.  (*Id.* ¶¶ 48-49.)  According to Sergeant Porter, the Detroit Police officers drew their guns and ordered Plaintiff to the ground, but he refused to comply.  (*Id.* ¶ 50.)  The Detroit Police officers then pulled Plaintiff to the ground and, in less than a minute, wrestled him into handcuffs.  (*Id.* ¶ 51.)  Plaintiff claims that he immediately got onto the ground when ordered to do so and that multiple officers hit, kicked, and

12

kneed him "a few times" while they placed him in handcuffs.[4]  (*Id*., Ex. 14 at 45-

46, 72.)  Plaintiff could not identify or describe the officers who allegedly hit,

kicked, or kneed him because he was face down on the ground.  (*Id*. at 73, 74, 75,

77, 82.)  Only Sergeant Porter and the Detroit Police officers were present when

Plaintiff was apprehended in the garage.  (ECF No. 43, Ex. 9; Ex. 10 ¶¶ 21-22; Ex.

11 ¶¶ 15-16, Ex. 13 ¶¶ 12-14; Ex. 9 ¶ 4; Ex. 15 ¶¶ 3-4; Ex. 16 ¶¶ 3-4; Ex. 17 ¶¶ 3-

4; Ex. 18 ¶ 3; Ex. 19 ¶ 3; Ex. 20 ¶ 3.)

After Plaintiff was handcuffed, Sergeant Porter noticed that Plaintiff was

bleeding from his buttock.  (*Id*., Ex. 8 ¶ 54.)  Sergeant Porter called EMS and

Plaintiff was transported to the hospital.  (*Id*.)

---

[4] In his Amended Complaint, which is verified, Plaintiff claims that "[w]hile [he] laid [sic] flat on the ground, defendants kicked and pressed their knees in the middle of [his] back while [he] continued laying on the ground, defendants asking [him] multiple questions for about 30 minutes, . . .."  (ECF No. 23 ¶ 21.)  Usually, the allegations in a verified complaint constitute evidence for purposes of a summary judgment motion.  *See Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).  However, where a plaintiff's statements in his or her verified complaint are contradicted by the plaintiff's deposition testimony, courts routinely hold that the verified complaint cannot create a genuine issue of material fact.  *See, e.g., Leary v. Livingston Cnty.*, 528 F.3d 434, 444 (6th Cir. 2008) ("When a claimant's testimony contradicts the allegations in his complaint, we will credit his later testimony.").  Here, Plaintiff testified at his deposition that he was kicked only a "few times" while he lay on the ground.  (ECF No. 44, Ex. 14 at 45-46.)  Thus, to the extent the allegations in paragraph twenty-one of Plaintiff's Amended Complaint possibly could be construed as asserting that Defendants kicked Plaintiff during the thirty minutes he claims he was laying on the ground, the Court accepts his deposition testimony as the accurate description of the encounter.

A warrant subsequently was secured to search Plaintiff's home.  (*Id*. ¶ 55.)
Sergeant Porter and Officers McCormick, Schneider, and Rochon, along with
officers from the Troy Police Department, assisted in executing the warrant.  (*Id*.)
The officers collected and seized various items, including a cash register drawer,
laptop, and cell phone stolen during the armed robbery in Troy, clothing matching
that worn by the armed robbery suspect, a .45 caliber loaded magazine and a box
of .45 caliber ammunition, and a CO2 pellet gun that resembled a pistol.  (ECF No.
43, Exs. 6, 7, 8 ¶ 55, 11 ¶ 19, 12 ¶ 30.)

Plaintiff was subsequently charged with and convicted of six felonies in state
court in connection with the armed robbery spree, vehicle chase, and foot chase.
(*See id*., Exs. 21-23.)

Plaintiff initiated this lawsuit on December 23, 2013, claiming that the force
used to secure his arrest (firing shots at him and hitting, kicking, and kneeing him
while he was handcuffed) violated his Fourth Amendment right to be free from the
use of excessive force.  Plaintiff also claims that this conduct constituted gross
negligence in violation of state law.  Plaintiff alleges that the City of Southfield
and Southfield Police Department are liable for failing to properly train their
officers.

14

III.    **Applicable Law and Analysis**

A.    **42 U.S.C. § 1983**

Plaintiff asserts his constitutional claim against Defendants pursuant to 42 U.S.C. § 1983.  To state a viable § 1983 claim, Plaintiff must show that a person acting under color of state law deprived him of a right secured by the Constitution or laws of the United States.  *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005).  Plaintiff claims that Defendants violated his Fourth Amendment right to be free from the use of excessive force.  There is no dispute that Defendants were acting under color of state law with respect to their involvement in Plaintiff's case.  The disputed issue is whether Plaintiff's Fourth Amendment rights were violated and, if so, by whom.

The latter inquiry is important because "[e]ach defendant's liability must be assessed individually based on his own actions."  *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citations omitted).  "To establish liability against an individual defendant acting under color of state law, a plaintiff must show that the defendant was 'personally involved' in the use of excessive force."  *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013) (citing *Binay*, 601 F.3d at 650).  Mere presence at the scene, without a showing of direct responsibility for the alleged constitutional violation, generally will not subject an officer to liability.  *Id.* (citing *Ghandi v. Police Dep't of Detroit*, 747 F.3d 338, 352 (6th Cir. 1984)).  A police

officer may be liable due to a failure to act to prevent the use of excessive force, but only where " '(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.' "  *Id.* at 620 (quoting *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008)) (additional quotation marks and citation omitted).

A municipality is not liable under § 1983 for the conduct of its employees or agents under the theory of respondeat superior.  *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)).  To establish a municipality's liability, the plaintiff must show that his constitutional rights were violated and that a policy or custom of the municipality was the "moving force" behind the deprivation of the plaintiff's rights.  *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 606-07 (6th Cir. 2007) (citing *Monell*, 436 U.S. at 694).

The Supreme Court addressed whether the Fourth Amendment is violated by an officer's use of deadly force against a fleeing suspected felon in *Tennessee v. Garner*, 471 U.S. 1 (1985).  There, the Court found unconstitutional a state statute authorizing the use of deadly force against fleeing suspected felons, whatever the circumstances.  *Id.* at 11.  The Court, however, did not forbid all use of deadly force in seizing suspects:

16

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11-12. The Supreme Court provided further guidance to analyze the reasonableness of an officer's use of deadly force in *Graham v. Connor*, 490 U.S. 386 (1989).

In *Graham*, the Supreme Court held that the Fourth Amendment's "objective reasonableness" standard applies to all claims alleging the use of excessive force-- deadly or not-- in the course of an arrest, investigatory stop, or other seizure. The Court cautioned that the "proper application" of this reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Court further cautioned:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-- in circumstances that are tense, uncertain, and rapidly evolving-- about the amount of force that is necessary in a particular situation.

17

*Id*. at 396-96 (citations omitted).  The Sixth Circuit subsequently elaborated on these cautionary remarks:

> [U]nder *Graham*, we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).  With these principles in mind, the Court turns to the conduct underlying Plaintiff's excessive force claim.

### 1.    Shots fired at Plaintiff

The totality of the circumstances supports Officer Matatall's use of force against Plaintiff as Plaintiff fled from the crashed Accord.  The officers, including Officer Matatall, were aware of seven armed robberies in the Detroit metropolitan area which occurred in the days preceding Plaintiff's capture.  They also were aware of the description of the suspect and that the suspect stole a 2007 Honda Accord with license plate CFP 1423.  Plaintiff matched the physical description of the suspect and was driving the stolen vehicle.[5]  When confronted by the police,

---

[5] Plaintiff, a black male, was 19 years old at the time of the shooting.  (ECF No. 43, Ex. 6.)  He was described by officers as being approximately 6'0" and 6'2".  (*Id*.) The Michigan Department of Corrections' Offender Tracking Information System ("OTIS") describes Plaintiff as a black male, 5'11", and 180 pounds.  *See* http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=805842.  The (cont'd . . .)

Plaintiff fled, swerved through traffic, ran a red light, led the police on a high speed chase through residential neighborhoods, and forced patrol cars attempting to block his escape to swerve in order to avoid collision. Even after crashing the Accord, Plaintiff fled on foot and then hid in a garage.

Further, Officer Matatall had several reasons to believe that Plaintiff was armed and dangerous. First, in each of the robberies, the suspect brandished a gun and threatened the clerks. Even if Plaintiff did not have a gun in the car when he was first spotted by the officers, he returned to his residence after initially evading the police and had an opportunity to retrieve a gun. Second, when Plaintiff exited the stolen Accord, he reached for his waistband which led Officer Matatall to believe that he might be armed. Significantly, Plaintiff admits to having grabbed at his waistband after crashing the Accord.

These facts reflect that Plaintiff was determined, regardless of the means, to avoid capture by the police. Under these circumstances, there was probable cause to believe that Plaintiff posed a threat of serious physical harm to the officers or others.

Plaintiff contends that the use of deadly force in his case was unreasonable because Officer Matatall failed to identify himself as a police officer and order

---

Court may take judicial notice of the information on OTIS. *See Ward v. Wolfenbarger*, 323 F. Supp. 2d 818, 821 n.3 (E.D. Mich. 2004).

19

Plaintiff to stop before firing at him.  Under the circumstances (which are distinguishable from the cases cited by Plaintiff), the Court does not believe that these omissions render Officer Matatall's actions unreasonable.  Specifically, before Officer Matatall shot at Plaintiff, officers in several semi-marked police cars with lights and sirens activated had chased and attempted to seize Plaintiff. Plaintiff's assertion in his affidavit that he believed carjackers were attempting to kill him when the shots were fired (*see* ECF No. 52, Att. B ¶ 5.)-- thereby suggesting that he did not know the police were attempting to seize him-- is therefore preposterous.  This is particularly so where Plaintiff acknowledged during his deposition that he was being chased by police, and testified that he did not stop because he was on probation at the time.  (ECF No. 44, Ex. 14 at 51.)

Plaintiff also makes much of the fact that Officer Matatall states in his affidavit that Plaintiff posed a "serious" threat, rather than a "significant" threat, as *Garner* requires before deadly force is used to prevent the escape of a felony suspect.  This is a distinction without a difference.  One definition of "serious" is "significant."  *See* Oxford English Dictionary (3d ed. 2013).

In short, when viewed in a light most favorable to Plaintiff, the evidence reveals no genuine issue of material fact and establishes that Officer Matatall did not violate Plaintiff's Fourth Amendment rights when he shot at Plaintiff.  There is no evidence that any other officer shot at Plaintiff, and because the Court

20

concludes that Officer Matatall did not use excessive force, the remaining

Defendants cannot be liable under failure to intervene or train theories.

### 2.    Force used when handcuffing Plaintiff

As an initial matter, Plaintiff fails to address the arguments Defendants raise

in support of their motion for summary judgment with respect to Plaintiff's claim

arising from his handcuffing.  For this reason, alone, the Court would grant

Defendants' motion as they have presented evidence in support of their motion

demonstrating their entitlement to summary judgment on this claim.  *See Brown v.*

*VHS of MI, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citing cases) ("This

Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to

have abandoned a claim when a plaintiff fails to address it in response to a motion

for summary judgment."); *see also Stough v. Mayville Cmty. Sch.*, 138 F.3d 612,

614 (6th Cir. 1989) (explaining that before granting summary judgment as a result

of the adverse party's failure to respond to the motion for summary judgment, the

court must examine the movant's motion to ensure that he has discharged his

burden of demonstrating the absence of a genuine issue as to a material fact).  The

Sixth Circuit has applied this well-established rule even to pro se plaintiffs.  *See,*

*e.g., Campbell v. Hines*, No. 12-4329, 2013 WL 7899224, at *4 (6th Cir. Aug. 8,

2013) (affirming the district court's grant of summary to the defendants on the pro

se plaintiff's hostile work environment and retaliation claims, where the plaintiff

failed to specifically address the defendants' arguments in response to their summary judgment motion).  Even if the Court did not deem Plaintiff to have abandoned this claim, it finds that Defendants' are entitled to summary judgment.

Plaintiff fails to produce evidence that would enable a trier of fact to identify those persons who were present when he was allegedly kicked, kneed, and punched before being handcuffed.  Defendants, on the other hand, demonstrate that only Sergeant Porter and Detroit police officers-- none of whom are named in this lawsuit-- were present and that only the Detroit police officers handcuffed Plaintiff.  As Plaintiff cannot identify which officer(s) kicked, kneed, or punched him, Sergeant Porter can be liable only under a failure to intervene theory.

Plaintiff does not state how long he was kicked, kneed, and punched, although he indicates that he was struck only a "few times."  (ECF No. 43, Ex. 14 at 45-46, 72.)  Sergeant Porter provides that the entire encounter between Plaintiff and the Detroit police officers lasted less than a minute.  (*Id*., Ex. 8 ¶ 51.)  This span of time was not sufficient for Sergeant Porter to perceive the alleged excessive force and develop and implement an intervention strategy.  *See Burley*, 729 F.3d at 619.  He thus is not liable for the alleged force used when handcuffing Plaintiff.  *See Kowolonek v. Moore*, 463 F. App'x 531, 539 (6th Cir. 2012) (concluding that the defendant officers were not liable under a failure to intervene theory for another officer's use of a taser against the plaintiff as the entire incident

22

lasted only minutes and thus there was no opportunity and means for the officers to stop it from happening); *Ontha v. Rutherford Cnty., Tenn*., 222 F. App'x 498, 506 (6th Cir. 2007) (finding that six or seven seconds was insufficient time to compel intervention).

The remaining Defendants are not liable for the allege use of force used when handcuffing Plaintiff because Plaintiff does not dispute (and concededly cannot show) that they were present in the garage when Plaintiff was finally seized. Failing to show that any Southfield police officer used excessive force against him when he was handcuffed, the City of Southfield and Southfield Police Department also are entitled to summary judgment on Plaintiff's excessive force claim based on this conduct.

### B.   Gross Negligence

Plaintiff's gross negligence claim is predicated on the alleged excessive force used against him. As such, it fails as a matter of law. *See VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004), overruled on other grounds in *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 224 n.33 (Mich. 2008).

In *VanVorous*, the plaintiff filed claims of assault and battery and gross negligence against the defendant police officers who had shot and killed the plaintiff's husband. 687 N.W.2d at 137. A federal court had previously adjudicated the plaintiff's Fourth Amendment excessive force claim in favor of the

officers.  *Id*. at 135.  The Michigan Court of Appeals determined that the plaintiff's

assault and battery claim was barred by the doctrine of collateral estoppel and that

her gross negligence claim failed as a matter of law.  *Id*. at 142-43.  As the court

explained:

> [P]laintiff's claim of gross negligence is fully premised on her claim
> of excessive force. . . . this Court has rejected attempts to transform
> claims involving elements of intentional torts into claims of gross
> negligence.  *Smith v. Stolberg*, 231 Mich. App. 256, 258-259, 586
> N.W.2d 103 (1998); *Sudul v. Hamtramck*, 221 Mich. App. 455, 458,
> 477, 562 N.W.2d 478 (1997).  Thus, plaintiff did not state a claim on
> which relief could be granted.

*Id*. at 143.  The Sixth Circuit has consistently applied this holding to dismiss gross

negligence claims premised on claims of excessive force.  *See, e.g., Bletz v.

Gribble*, 641 F.3d 743, 756 (6th Cir. 2011); *Miller v. Sanilac Cnty*., 606 F.3d 240,

254 (6th Cir. 2010).

Even if this Court were to construe Plaintiff's claim as alleging assault and

battery, the claim would fail because the Court has found the force used by any

defendant named in this action to have been reasonable.  *See VanVorous*, 687

N.W.2d at 142 ("To find for plaintiff on [her assault-and-battery] claims, our

courts would have to determine the officers' actions were not justified because

they were not objectively reasonable under the circumstances.  Because the federal

district court reached and decided the question [in resolving the plaintiff's § 1983

24

excessive-force claim], further litigation regarding this issue was collaterally estopped.").

The Court therefore is granting summary judgment to Defendants on Plaintiff's gross negligence claim.

## IV.   Conclusion

In summary, the Court holds that the only force Officer Matatall used against Plaintiff was reasonable under the circumstances and that he therefore is entitled to summary judgment.  Sergeant Porter also is entitled to summary judgment because the undisputed evidence reflects that he did not employ any of the force allegedly used against Plaintiff, and the Court concludes that he is not liable for failing to intervene when force was used.  Plaintiff fails to demonstrate that any other officer named in this lawsuit was personally involved in or present when the alleged use of excessive force was used against him.  Thus Plaintiff's claims against those Defendants also fails.  Having reached these conclusions, the Court holds that the City of Southfield and the Southfield Police Department are entitled to summary judgment as well.

Accordingly,

**IT IS ORDERED**, that Defendants' motion for summary judgment is

**GRANTED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: November 12, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of
record and/or pro se parties on this date, November 12, 2015, by electronic and/or
U.S. First Class mail.

s/ Richard Loury
Case Manager

26